Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,847-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

ROBERT LADELL                                   Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 341,935

Honorable Katherine Dorroh, Judge

* * * * *

FRANK E. BROWN, JR.                      Counsel for Appellant


JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

RICHARD S. FEINBERG
RON C. STAMPS
BRITNEY A. GREEN
Assistant District Attorneys

* * * * *

Before GARRETT, McCALLUM, and THOMPSON, JJ.

**THOMPSON, J.**

This criminal appeal of convictions for First Degree Rape[1] and Third Degree Rape[2] arises from the First Judicial District Court, Parish of Caddo, the Honorable Katherine Dorroh presiding. The defendant, Robert Ladell (hereinafter "Ladell"), was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on the charge of first degree rape and was sentenced to 20 years' imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for the conviction for third degree rape. The sentences were ordered to be served concurrently. Defendant now appeals. For the following reasons, we hereby affirm both sentences.

### FACTS AND PROCEDURAL HISTORY

Ladell was indicted for the first degree rape of S.T., a victim under the age of 13, in violation of La. R.S. 14:42(A)(4), and for the first degree rape of J.S., a victim under the age of 13, in violation of La. R.S. 14:42(A)(4). A jury trial commenced on November 5, 2018.

S.T. testified that she was 18 years old at the time of trial and that she would have been nine years old when Ladell began to abuse her. At that time, she lived with her mother at her grandmother's house. S.T. stated that she also had a relationship with her father. S.T. testified that, after school, she would go to her great-grandmother's house. She would often go to her aunt, Diane O'Kray's (hereinafter "O'Kray"), house to eat after arriving at her great-grandmother's. O'Kray confirmed that the bus would drop S.T.

---

[1] La. R.S. 14:42.

[2] La. R.S. 14:43.

off at her house after school. Catherine Johnson (hereinafter "Johnson"), another aunt, and S.T.'s cousin, Ladell, also lived at O'Kray's house. S.T. testified that Ladell would sometimes be at O'Kray's house when she was there after school.

S.T. testified that she would often watch TV in Johnson's bedroom. S.T. testified that, at one point, Ladell entered the bedroom and shut the door, then sat on the bed with her and touched her private area. S.T. stated that she voiced her objection and tried to resist Ladell. S.T. testified that Ladell also pulled his penis out of the zipper of his pants and forced her to touch it. Ladell then forced S.T. to put his penis in her mouth. S.T. testified that this occurred on three different occasions while she was at O'Kray's house. In 2016, S.T. disclosed the details of the abuse to her mother after a family meeting at which Ladell apologized to her for his inappropriate conduct.

Chisa Taylor (hereinafter "Taylor"), S.T.'s mother, testified that Ladell was her first cousin. Taylor testified that, in May 2016, S.T. disclosed to her that Ladell had touched her "butt and private area" when she was eight or nine years old. Taylor testified that Ladell apologized for "touching her" in front of the family. S.T. later told Taylor that the touching happened when her mother was at work or at school and the incidents had occurred at her grandmother's house. O'Kray testified that Ladell apologized in front of family members for slapping S.T. "on the butt one time." However, O'Kray disputed S.T.'s account of sexual abuse, testifying that Ladell was never alone with S.T, but she couldn't be positive about what occurred or not when all the kids were at the house at the same time. Johnson testified that she never saw Ladell in her bedroom with S.T.

2

LaMiracle Taylor (hereinafter "LaMiracle"), S.T.'s aunt and Ladell's cousin, testified that she lived in O'Kray's house for a period of time, but never saw Ladell and S.T. alone together.

Sherman Bradley (hereinafter "Bradley"), S.T.'s father, testified that, in May 2016, S.T. disclosed to him that Ladell had been forcing himself upon her since she was nine years old. Bradley stated that, after learning about the incidents from S.T., he called the police. S.T.'s stepmother, Jamela Bradley (hereinafter "Jamela"), corroborated Bradley's testimony. Jamela testified that S.T. was crying and "very distraught" when she disclosed the abuse. Jamela confirmed that S.T. reported Ladell's apology to the family.

S.T. identified the defendant in open court. She recalled making a recorded statement at the Gingerbread House. A video of that statement was admitted as State's Exhibit 1 and was played for the jury. S.T. testified that she was not examined by a physician after any of the incidents or after telling her family about the incidents.

J.S. testified that she was 15 years old at the time of trial, and that she would have been 10 years old when Ladell began to abuse her in 2013. At that time, she lived with her mother, who was dating Robert Ladell. J.S. testified that Ladell occasionally spent the night at their house. Samantha Smith (hereinafter "Smith"), J.S.'s mother, testified that Ladell would sometimes spend the night three or four nights per week. Ladell slept in a room with Smith, while J.S.'s 16-year-old brother, Jeremiah, slept in the den, and J.S.'s 11-year-old brother, Emanuel, shared a room with her. Smith did not have a vehicle, so Ladell often provided transportation for the family.

3

J.S. testified that, just before she turned 11, Ladell began talking to her in a way that made her feel out of place and uncomfortable, and that "he would say things like hey sexy and, you know, you so cute and stuff like that." J.S. began having Emanuel sleep in the bottom bunk bed with her so that Ladell would not try to touch her at night. J.S. further testified that Ladell still tried to touch her while in the bed, but she would pretend to be asleep.

J.S. stated that she was almost 11 years old when Ladell first touched her inappropriately. Ladell had two (2) daiquiris that night, but J.S. testified that he did not seem intoxicated. J.S. testified that Ladell touched both of her breasts, and she hit him to try and fend off his advances. Her mother and two brothers were present in the house, but not in the same room, at the time of the incident. J.S. testified that the sexual misconduct continued for approximately a year and a half. During this time, J.S. testified that Ladell would fondle, penetrate, and make her perform oral sex on him. She had intercourse with Ladell two or three times, and Ladell performed anal sex on her. J.S. testified that Jeremiah was home most of the time when Ladell abused her, but was not in the room. J.S. stated that Ladell would take his frustrations out on her mother by hitting her if J.S. refused to perform sexual acts on him. However, J.S. stated that she never saw Ladell hit her mother, but just assumed that he did. J.S. testified that Ladell choked her mother on one occasion, and she knew this because her mother told her.

J.S. testified that Derrick Critton (hereinafter "Critton"), a neighbor, was the first person that she told about the events with Ladell. Critton testified that he lived across the street from J.S.'s family and was friendly with them. He testified that, on June 30, 2015, J.S. came to his house to talk

4

to him. Critton described J.S. as "real choked up" when she told him that Ladell had been molesting her since she was 11 years old. Critton testified that J.S. described vaginal, anal, and oral sex with Ladell. J.S. told Critton that she wanted to go to a slumber party, but that Ladell told her that "if she wanted to go then she had to suck on it," prompting her to disclose. Critton testified that he was very angry, but that J.S. stopped him from attempting to harm Ladell.

J.S. agreed to tell her mother about the abuse, and Critton called the police. Smith testified that she "just lost it" when J.S. told her that Ladell had been raping her for years. J.S.'s mother admitted that there were times when Ladell had been alone with J.S. J.S.'s mother testified that J.S. would sometimes be in the vehicle with her when she picked up Ladell from his janitorial job and that J.S. sometimes went inside to use the bathroom while her mother waited in the truck. J.S.'s mother stated that J.S. told her that Ladell tried to get J.S. to have sex with him in the bathroom while her mother waited outside in the truck.

J.S. identified the defendant in open court. She recalled making a recorded statement at the Gingerbread House. A video of that statement was admitted as State's Exhibit 2 and was played for the jury. J.S. testified that, after her interview at the Gingerbread House, she underwent a physical examination, but too much time had passed for any evidence to be recovered.

Detective Michael Jones (hereinafter "Det. Jones"), of the Shreveport Police Department, testified that he investigated the two cases involving Ladell. Det. Jones testified that the disclosures made by J.S. and S.T. were very similar, in that they both described vaginal, anal, and oral sex. Det.

5

Jones testified that there was no relationship between J.S. and S.T. J.S. was the daughter of Ladell's girlfriend, while S.T. was Ladell's cousin.

Det. Jones testified that he took a voluntary, recorded statement from Ladell on June 25, 2016, after advising Ladell of his *Miranda* rights. A copy of Ladell's statement was admitted as State's Exhibit 4 and was played for the jury. During Ladell's interview, he indicated to Det. Jones that he was a teenager and attended J.S. Clark, a junior high school, at the time of the alleged abuse. Det. Jones testified that Ladell's birthday was October 31, 1989, actually making him 23-25 years old at the time the abuse of J.S. and 19-25 at the time of the abuse of S.T. Det. Jones testified that Ladell admitted to "hunching" or humping S.T.

Alex Person (hereinafter "Person"), a forensic interviewer and education coordinator at the Gingerbread House, was admitted as an expert in the field of forensic interviewing. Person testified that she conducted interviews of both victims in this case. She stated that J.S. was able to provide great detail about her abuse and was "ready to talk about what had happened to her." Person testified that J.S. described vaginal, anal, and oral sex with Ladell. Person stated that S.T. was more reluctant to discuss the abuse and was less forthcoming with details. Person testified that S.T. did describe oral sex with Ladell.

Person testified that delayed reporting of sexual abuse is very common in child victims. She stated that 90% of the abusers are known to the victim, so the child will have to gather their thoughts and select a trusted person to whom to disclose. Person further testified that a delay in reporting often happens due to fear, being threatened, or processing what has happened. She explained that, because most abusers are known to the

6

victim, the child will often worry about causing a rift or trouble in their family by disclosing.

Det. Jones testified that, by the time he was made aware of the allegations, it was well outside of the time frame to collect physical evidence from the victims or the crime scenes. Furthermore, Ladell had stayed in the both residences, so his fingerprints and DNA would be expected to be present in those locations. Person confirmed that delayed reporting often caused a lack of physical evidence.

The defense witnesses consisted of character witnesses who testified as to Ladell's good character in the community. Rashima Owens, a co-worker of Ladell, testified that Ladell had a good reputation, but admitted that she did not have a relationship with him outside of work. Takia Norris, another co-worker, testified that she had occasionally socialized with Ladell outside of work and that she knew him to have a good reputation. Renita Lanier, Ladell's supervisor at work, testified that he was a conscientious and honest employee. Alford Ladell, Sr., Ladell's uncle, testified that Ladell had a good reputation in the community. De Quandren Ladell, Ladell's cousin, testified that he considered Ladell to be honest and to be a person of integrity.

On November 7, 2018, the jury returned a verdict of guilty of the third degree rape of S.T and guilty of the first degree rape of J.S. On November 14, 2018, Ladell was sentenced to 20 years' imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence on the conviction for third degree rape, and to life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence on the conviction for first degree rape. This appeal followed.

**ASSIGNMENTS OF ERROR**

Though incorrectly numbered, Defendant has assigned the following four (4) errors:

(1) The evidence presented by the State was insufficient to support the conviction of defendant for First Degree Rape, even when viewed in the light most favorable to the State.

(2) The trial court erred in denying defendant's challenges for cause of prospective jurors and granting the State's challenges for cause.

(3) The trial court erred by releasing a juror *sua sponte* prior to deliberations with no "just legal cause" being shown.

(5) There are errors patent on the face of the record without examining the pleadings or proceedings.

**DISCUSSION**

**Assignment of Error No. 1**

On review, the defendant argues that no rational jury would have found him guilty beyond a reasonable doubt based upon the evidence presented by the State. He asserts that the State presented an entirely circumstantial case, and that there was no physical or forensic evidence presented by the State to corroborate the testimony of the two victims. Ladell also asserts that the victims' testimony was inconsistent.

In response, the State asserts that the victims did not know each other, but that they corroborated each other's testimony, that Ladell gave an apology to the family of S.T., and that the lack of physical or forensic evidence was explained by the victims' delay in reporting the assaults. The State argues that the testimony of a sexual assault victim alone is sufficient to establish the elements of the crime, and that the jury viewed the totality of the facts presented in this case and found the testimony of the victims credible.

*Applicable Law*

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 05/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Bass*, 51,411 (La. App. 2 Cir. 06/21/17), 223 So. 3d 1242, *writ not cons.*, 18-0296 (La. 04/16/18), 239 So. 3d 830. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 02/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 01/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/06/09), 21 So. 3d 297, 12-0717 (La. 09/12/12), 98 So. 3d 305.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 01/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 50,643 (La. App. 2 Cir. 06/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 05/19/17), 221 So. 3d 78; *State v. Gullette*, 43,032 (La. App. 2 Cir. 02/13/08), 975 So. 2d 753. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95),

9

661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 04/15/15), 164 So. 3d 331.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly*, *supra*; *State v. Green*, *supra*.

The trier of fact is charged with weighing the credibility of this evidence and, on review, the same standard as in *Jackson v. Virginia* is applied, giving great deference to the fact finder's conclusions. *State v. Green*, *supra*. When the trier of fact reasonably rejects the hypothesis of innocence advanced by a defendant, the hypothesis fails, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *State v. Sosa*, 05-0213 (La. 01/19/06), 921 So. 2d 94; *State v. Captville*, 82-2206 (La. 1984), 448 So. 2d 676.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Green*, *supra*; *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, *writ denied*, 12-2667 (La. 05/24/13), 116 So. 3d 659. Such testimony alone is sufficient even where the state does not introduce

10

medical, scientific, or physical evidence. *State v. Larkins*, 51,540 (La. App.

2 Cir. 09/27/17), 243 So. 3d 1220, *writ denied*, 17-1900 (La. 09/28/18), 253

So. 3d 154. The trier of fact is charged to make a credibility determination

and may, within the bounds of rationality, accept or reject the testimony of

any witness in whole or in part; the reviewing court may impinge on that

discretion only to the extent necessary to guarantee the fundamental due

process of law. *State v. Casey*, *supra*.

La. R.S. 14:42 provides, in pertinent part:

A. First degree rape is a rape committed upon a person sixty-
five years of age or older or where the anal, oral, or vaginal
sexual intercourse is deemed to be without lawful consent of
the victim because it is committed under any one or more of the
following circumstances:

. . . .

(4) When the victim is under the age of thirteen years. Lack of
knowledge of the victim's age shall not be a defense.

La. R.S. 14:43 provides, in pertinent part:

A. Third degree rape is a rape committed when the anal, oral, or
vaginal sexual intercourse is deemed to be without the lawful
consent of a victim because it is committed under any one or
more of the following circumstances:

. . . .

(4) When the offender acts without the consent of the victim.

***Application of Law to Facts***

In this case, the evidence was sufficient to support the jury's finding

that Ladell committed the third degree rape of S.T. and the first degree rape

of J.S. Testimony showed that S.T. often went to her aunt's house after

school and that Ladell lived with that aunt. S.T. testified that, on at least

three different occasions, Ladell forced her to perform oral sex on him. She

further testified that, on at least one occasion, Ladell touched her "private

11

parts" underneath her clothing.  S.T. identified the defendant in open court as the man who raped her.  Testimony showed that Ladell apologized in front of witnesses for "touching" S.T.  S.T.'s father and stepmother described her demeanor upon disclosure of the abuse as "very distraught."

J.S., the second victim, testified that Ladell began to abuse her when she was 10 years old.  J.S.'s mother confirmed that she was in a relationship with Ladell at that time and that he would spend three or four nights per week at their house.  J.S. testified that, over the course of a year and a half, Ladell would fondle, penetrate, and force her to perform oral sex on him.  She testified that Ladell threatened to physically harm her mother when she refused him.  J.S. identified the defendant in open court as the man who raped her.

Although several of the defense witnesses testified that Ladell had never been alone with S.T. and the defense argued that the victims had not disclosed the sexual abuse at the time of the occurrences, the jury clearly found the victims' testimony to be credible and found the expert testimony, provided by Person, regarding delayed reporting of sexual abuse in children to be relevant.  Despite the fact that the victims were unknown to each other, they both described being fondled and forced to perform oral sex by Ladell. The absence of physical evidence was explained by Det. Jones and Person.

Ultimately, it was the jury's decision, as the fact-finder, to assess the credibility of the witnesses and to weigh the evidence.  The trier of fact weighed the evidence and concluded there was proof beyond a reasonable doubt that Ladell had committed the third degree rape of S.T. and the first degree rape of J.S.  The jury's decision should not be disturbed on appeal. Therefore, this assignment of error is without merit.

12

**Assignment of Error No. 2**

On review, the defendant argues that he was denied a fair trial by the state's use of challenges for cause to exclude African-American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Specifically, Ladell objects to the dismissal of Shirley Germany, Stanley Moore, and Bobbie Thomas, for cause concerning the issue of a life sentence. Ladell asserts that the state used the repeated questioning of jurors regarding the possible life sentence as a pretext to disqualify African-American jurors.

In response, the state argues that *Batson*, *supra*, is inapplicable here because the challenges objected to in this case were for cause, rather than peremptory. The state argues that each of the jurors was properly dismissed for cause because each juror clearly stated that they could not follow the law if life imprisonment was a possible sentence. The state further argues that the defendant failed to show that the state made the challenges for a racially discriminatory purpose.

*Applicable Law*

The purpose of *voir dire* is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercising cause and peremptory challenges. *State v. Turner*, 16-1841 (La. 12/05/18), 263 So. 3d 337. Although the accused is entitled to full and complete *voir dire*, La. Const. art. I, § 17, the scope of counsel's examination rests within the discretion of the trial judge, and *voir dire* rulings will not be disturbed on appeal absent abuse of that discretion. La. C. Cr. P. art. 786; *Turner*, *supra*; *State v. Robertson*, 92-2660 (La. 01/14/94), 630 So. 2d 1278.

13

La. C. Cr. P. art. 797 provides:

The state or the defendant may challenge a juror for cause on the ground that:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

In ruling on a challenge for cause, the trial court is vested with broad discretion and its ruling and will be reversed only when the *voir dire* record as a whole reveals an abuse of discretion. *Turner*, *supra*; *Robertson*, *supra*; *State v. Ross*, 623 So. 2d 643 (La. 1993). "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied." *Turner*, *supra*, citing *State v. Hallal*, 557 So. 2d 1388, (La. 1990).

### *Application of Law to Facts*

In *Batson*, *supra*, the Supreme Court held that it is an equal protection violation for the state to exercise its peremptory strikes to remove jurors

14

from the venire panel solely on the basis of the juror's race. *Turner*, *supra*. In this case, because the defendant complains solely about the state's use of challenges for cause, his reliance on *Batson*, *supra*, is misplaced, and the challenges should be analyzed under La. C. Cr. P. art. 797 and related case law.

Jury selection began on November 5, 2018. The state used 10 peremptory challenges and made 6 challenges for cause. The defense used 12 peremptory challenges and made 2 challenges for cause. On appeal, the defendant specifically objects to the dismissal for cause of three jurors: Shirley Germany, Stanley Moore, and Bobbie Thomas.

As to Shirley Germany (hereinafter "Germany"), the following exchange occurred during *voir dire*:

> MS. GREEN: Would you hesitate to vote guilty, because you know it carries a life sentence?
>
> PROSPECTIVE JUROR S. GERMANY: I might would, yes.
>
> MS. GREEN: You might would?
>
> PROSPECTIVE JUROR S. GERMANY: Yes.
>
> . . . .
>
> PROSPECTIVE JUROR S. GERMANY: Yeah. I know the aggravated rape, it's really, really bad, and also, it's two victims there, because the person that did it evidently had some type of a problem, why they're doing this, committing these types of crimes, but to put them in prison for life, no, I can't go along with that.

The defense did not individually question Germany. The state challenged Germany for cause, arguing that her answers indicated that she could not find the defendant guilty because the punishment was a mandatory life sentence. The trial court granted the challenge for cause, quoting verbatim Germany's answers to the state's questioning.

15

Although Germany's answers initially indicated only a hesitancy to convict the defendant based upon the possible life sentence faced, the record as a whole supports the trial court's ruling. When questioned further regarding her feelings on the imposition of a mandatory life sentence, Germany explicitly stated, "to put them in prison for life, no, I can't go along with that." Germany expressed that she would be unable to accept the law as given to her and render a verdict of guilty of the charged offense of first degree rape because it carried a mandatory life sentence. As such, the trial court did not abuse its discretion in granting the state's challenge for cause as to Shirley Germany.

As to Stanley Moore (hereinafter "Moore"), the following exchange took place when Moore was asked whether he could vote guilty if the state proved its case beyond a reasonable doubt:

> PROSPECTIVE JUROR S. MOORE, JR.: (No response.)
>
> MS. GREEN: And you're toiling Mr. Moore.
>
> PROSPECTIVE JUROR S. MOORE, JR.: Yes.
>
> MS. GREEN: And it's okay. What are you toiling about? What's the sticking point?
>
> PROSPECTIVE JUROR S. MOORE, JR.: A life sentence.
>
> MS. GREEN: Okay.
>
> PROSPECTIVE JUROR S. MOORE, JR.: I just don't know. I feel like I wouldn't want that to be weighing on my conscience.
>
> . . . .
>
> MS. GREEN: And it's okay, Mr. Moore, and it's okay. It should be grappled with. And if that's your answer, that, hey, Ms. Green, you can prove your case, and don't take it personally, but I'm not doing it because I can't stand for that to be on my conscience. Is that your answer?
>
> PROSPECTIVE JUROR S. MOORE, JR.: Yes.

16

The defense did not individually question Moore. The state challenged Moore for cause, arguing that his answers, as well as his demeanor and his struggle with the issue of a life sentence, reflected that he could not find the defendant guilty because a life sentence would be imposed. The defense argued that, while Moore expressed some misgivings about the life sentence, he did not firmly say that he would not vote to convict because of the life sentence. The trial court noted that Moore hesitated for a long time before answering the state's question regarding whether he could vote guilty. The trial court further noted that Moore stated that, "[i]f the state proves its case, I can't vote guilty, because that would be on my conscience, that life sentence." Based upon Moore's statements and the trial court's observations of his demeanor, the state's challenge for cause was granted.

Although Moore initially struggled with the issue of a life sentence for a conviction for first degree rape, the record as a whole supports the trial court's ruling. The trial court's reasons for ruling reflect that the court considered Moore's demeanor, as well as his specific answers, in determining that he would be unable to accept the law as given to him and render a verdict of guilty of the charged offense of first degree rape because it carried a mandatory life sentence. As such, the trial court did not abuse its discretion in granting the state's challenge for cause as to Stanley Moore.

As to Bobbie Thomas (hereinafter "Thomas"), the following exchange occurred during *voir dire*:

> MS. GREEN: Ms. Thomas, you mentioned it earlier when we first began, I believe, that ---

PROSPECTIVE JUROR B. THOMAS: I wouldn't want him to get a life sentence either.

MS. GREEN: Okay. And that even if the state proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR B. THOMAS: Right.

MS. GREEN: Okay. And you cannot do it, even though the law says, hey, if the state proves its case, you find him guilty, and know that there's a life sentence, you cannot do it. I appreciate it. Thank you.

PROSPECTIVE JUROR B. THOMAS: Um-hum.

The defense did not individually question Thomas. The state challenged Thomas for cause, arguing that she said repeatedly that she could not convict the defendant because of the life sentence. The trial court granted the challenge for cause, finding that Thomas' answers indicated that the life sentence would affect the way she would vote in this case and that she explicitly stated that she could not convict because of the life sentence.

Thomas repeatedly, explicitly, and voluntarily stated that she "wouldn't want to him to get a life sentence," even if the state proved its case. Thomas clearly expressed that she would be unable to accept the law as given to her and render a verdict of guilty of the charged offense of first degree rape because it carried a mandatory life sentence. As such, the trial court did not abuse its discretion in granting the state's challenge for cause as to Bobbie Thomas.

For the foregoing reasons, this assignment of error is without merit.

**Assignment of Error No. 3**

On review, the defendant argues that the trial court erred in releasing Patricia Nichols (hereinafter "Nichols") from the jury because of her relationship with his uncle, Alford Ladell. Ladell argues that Nichols

testified that she was merely Alford Ladell's neighbor, and that she did not know him well, did not socialize with him, and did not visit his home. Ladell asserts that Nichols testified that she could be a fair and impartial juror, and that there was no indication of bias or partiality by which the trial court could disqualify Nichols.

In response, the state argues that Nichols was properly dismissed because her testimony and demeanor showed that she would find it difficult to remain impartial in this case due to her relationship with Alford Ladell. The state asserts that the trial court properly considered Nichols' responses as a whole. The state notes that the relationship between Nichols and Alford Ladell was unknown to the state or the court at the time of jury selection.

### *Applicable Law*

La. C. Cr. P. art. 795 provides that "[a] juror shall not be challenged for cause after having been temporarily accepted pursuant to Paragraph A of Article 788 unless the challenging party shows that the cause was not known to him prior to that time."

### *Application of Law to Facts*

Alford Ladell, Sr., the defendant's uncle, testified on the defendant's behalf. Following the testimony of Alford Ladell, the trial court was handed a note from juror Nichols, who advised the court that she knew the witness, Alford Ladell. The names of the defense witnesses had not been previously provided to the jury. The parties agreed to question the juror regarding the relationship.

Nichols testified that she did not know Alford Ladell "well at all," and that they happened to live on the same street, but that they did not socialize with each other. Nichols stated that she believed that she could be fair in

this matter, but that it would be difficult to see Alford Ladell after the trial.

The following exchange took place:

> THE COURT: What I'm concerned about is, if, after all of the evidence is presented and you are deliberating, are you going to have a hard time making a decision in this case knowing Mr. Ladell? I mean, are you going to be worried that Mr. Ladell is going to be angry with you or disturbed with you or anything like that? Mr. Alford Ladell.
>
> MS. NICHOLS: Yes, ma'am, I understand. I won't say that I would be worried, but just if I made the decision and it wasn't, and if I could be this frank, a decision that was for the better of that family, I don't know whether I would even want to see him or not. I might would feel bad, if I can just be honest.
>
> . . . .
>
> MR. STAMPS: Prior to –
>
> MS. NICHOLS: -- I would feel.
>
> MR. STAMPS: -- you seeing him, you had no concern about the family, but once you saw him, you just said, I would be concerned about making a decision that's not good for the family.
>
> MS. NICHOLS: Yes, yes, sir.

Although Nichols stated that she believed that she could follow the law and render a verdict of guilty if the state proved its case, she "still would feel bad if [she] saw him."

The state challenged Nichols for cause, arguing that her concern for the defendant's family is not something which should be considered during deliberations. The state argued that her concern for the defendant's family was an outside factor that had begun to influence her decision to the degree that she felt a duty to notify the court. The state further noted that Nichols' demeanor during questioning, dropping her head and wrinkling her face, indicated that she was struggling with the idea of rendering a guilty verdict. The defense argued that Nichols stated unequivocally that she could follow

20

the law and render a guilty a verdict if the state provided evidence of proof beyond a reasonable doubt.

The trial court was "not convinced that [Nichols] was unequivocal," noting that she hesitated and that her demeanor gave the trial court "great concern." The trial court took the matter under advisement for a short time, after which the challenge for cause was granted. The trial court was not satisfied that Nichols would be impartial based upon "observations of her demeanor, her facial expressions, her body language."

It is clear from the record that the basis for the state's challenge for cause as to Nichols was unknown to the parties and to the juror herself until after the trial had commenced and Alford Ladell, Sr., had testified. Although Nichols stated that she believed that she should follow the law as given to her by the court, she repeatedly expressed her concern that the Ladell family would be hurt by her decision. The trial court specifically considered Nichols' body language as a factor in determining that she would be impaired in making a decision during deliberations, noting that she dropped her head and wrinkled her face during questioning. As such, the trial court did not abuse its discretion in granting the state's challenge for cause as to Patricia Nichols.

For the foregoing reasons, this assignment of error is without merit.

**Assignment of Error No. 5[3]**

On review, the defendant argues that "[t]here are errors discoverable by a mere inspection of the pleadings and proceedings and without

---

[3] As noted above, Appellant's assignments of error were improperly numbered. Therefore, the fourth assignment of error is labeled as number 5 instead of number 4.

21

inspection of the evidence." La. C. Cr. P. art. 920 provides for the scope of appellate review, as follows:

> The following matters and no others shall be considered on appeal:
>
> (1) An error designated in the assignment of errors; and
>
> (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

The record in this case has been examined pursuant to the mandate of La. C. Cr. P. art. 920(2) and no errors patent were found. Therefore, this assignment of error is likewise without merit.

## CONCLUSION

For the foregoing reasons, Defendant Robert Ladell's convictions and sentences are affirmed.

**AFFIRMED.**